Michael J. Manning, Esq. (SBN 286879)
**MANNING LAW, APC**
26100 Towne Centre Drive
Foothill Ranch, CA 92610
Office: (949) 200-8755
Email: privacy@manninglawoffice.com

Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff: JOHN TASKER

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOHN TASKER, an individual,<br><br>Plaintiff,<br><br>v.<br><br>BMO BANK, N.A., an Illinois corporation, and DOES 1-10, inclusive,<br><br>Defendants. | Case No: 5:25-cv-1304 CV (SPx)<br><br>**FIRST AMENDED COMPLAINT**<br>1. Cal. Penal Code § 638.51<br>2. Cal. Civil Code § 1798.100, *et seq.*<br>3. Cal. Bus. & Prof. Code § 17200, *et seq.*<br><br>**CLASS ACTION** |

## I. NATURE OF THE ACTION

1. Defendant BMO BANK, N.A. ("Defendant" or "BMO") owns and operates a website, www.bmo.com (the "Website").

2. This is a class action lawsuit brought by Plaintiff on behalf of himself and on behalf of all California residents who have accessed the Website.

3. Plaintiff JOHN TASKER files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendant. Plaintiff brings this action based upon personal knowledge of the facts pertaining to him, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

4. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website to monitor user interactions. These trackers typically take the form of a small, invisible image (often 1x1 pixels in size) or a lightweight JavaScript snippet that executes when a user loads a webpage or completes an action.

5. When triggered, the pixel sends data—such as page views, session duration, referrer URLs, IP address, and browser details—from the user's browser to a third-party server. Pixel trackers are widely used in digital marketing and analytics to assess user engagement, measure campaign performance, and personalize advertising.

6. When users visit the Website, Defendant causes trackers to be embedded on Website visitors' internet browsers, including but not limited to:

- AdRoll Tracker
- Google Tag Manager
- Facebook Tracker
- The Trade Desk Tracker

7. The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website as described herein for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies that go beyond Defendant's direct needs for their own financial

gain. The above-listed trackers, together with the additional trackers identified on **Exhibit A** to this Complaint (which are incorporated by reference herein), are referred to herein collectively as the "Trackers."

8. The Trackers are operated by separate and distinct third parties: NextRoll, Inc. (as to the AdRoll Tracker), Google, LLC (as to Google Tag Manager), , Meta Platforms, Inc. (as to the Facebook Tracker) and The Trade Desk, Inc. (as to The Trade Desk Tracker) (collectively the "Third Parties"). Defendant enables the Trackers, which cause user data to be transmitted to third-party servers to collect Website visitors' IP address and other information, to identify them, and to facilitate the monetization of user data through targeted marketing and advertisement brokerages.

9. Through the Trackers, the Third Parties collect Website users' information including IP addresses, device and browser type, screen resolution, operating system, pages visited, time spent on each page, scroll depth, mouse movements, clicks, referring URLs, unique identifiers (such as cookies and advertising IDs), geographic location based on IP, user session duration, form interactions, and behavioral data used for profiling, ad targeting, cross-device identification, and/or real-time bidding (the "User Information"). Defendant and the Third Parties then use the User Information for hyper-targeted marketing and advertising and to generate revenue.

10. Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device fingerprints, and other non-content signaling metadata, they qualify as "pen registers" and/or "trap and trace devices." Cal. Penal Code § 638.50. These trackers operate without user engagement and silently intercept routing and addressing information for commercial purposes. *Greenley v. Kochava, Inc.*, 2023 WL 4833466 (S.D. Cal. July 27, 2023).

11. Plaintiff and the Class Members did not consent to the Trackers being installed, executed, embedded or injected on their devices and did not expect disclosure and/or monetization of their information. By installing and using the Trackers without prior consent and without a court order, Defendant violated CIPA section 638.51.

12. Defendant's published privacy policies claim that tracking is used only for security, personalization, fraud prevention and marketing with notice and user control. To the contrary, the Website initiates numerous third party tracker requests without prior user interaction, which violates Defendant's claim of user notice and control.

13. Plaintiff brings this action to prevent Defendant from further violating the privacy rights of California residents.

14. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II. PARTIES

15. Plaintiff JOHN TASKER ("Plaintiff") is a California citizen residing in San Bernardino County and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred on multiple instances during the class period prior to the filing of the complaint in this matter. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

16. Defendant BMO BANK, N.A. is an Illinois limited liability company that owns, operates and/or controls the Website which is an online platform that offers goods and services to consumers.

17. BMO BANK, N.A. is a subsidiary of the Toronto-based Bank of Montreal and is a prominent financial institution in the United States. BMO BANK, N.A. operates under a unified global brand and is recognized as one of the largest banks in the U.S.A., ranking 15th by total assets as of 2024. The bank provides a wide array of services, including consumer banking, corporate banking, private equity, investment banking, wealth management, and insurance.

18. In the United States, BMO has established a significant presence with over 500 branches and access to more than 40,000 ATMs nationwide. The bank offers diverse financial products tailored for personal and business needs, including checking accounts with features like fee-free ATM transactions and digital banking tools.

19. BMO BANK, N.A.'s website serves as a central hub for its digital banking services and customer resources. Through its platform, users can access features such as online account management, bill payments, fund transfers, and mobile check deposits. The site also offers tools like "BMO Total Look," which helps customers track spending and manage finances across accounts.

## III. JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

21. This Court has personal jurisdiction over Defendant because, on information and belief, Defendant has purposefully directed its activities to the Central District of California by regularly engaging with individuals in California through its website. Defendant's illegal conduct is directed at and harms California residents, including Plaintiff, and if not for Defendant's contact with the forum, Plaintiff would not have suffered harm.

22. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391 because Defendant (1) is authorized to conduct business in this District and has intentionally availed itself of the laws and markets within this District; (2) does substantial business within this District; (3) is subject to personal jurisdiction in this District because it has availed itself of the laws and markets within this District; and (4) the injury to Plaintiff occurred within this District.

## IV. GENERAL ALLEGATIONS

### 1. *The California Invasion of Privacy Act (CIPA)*

23. Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications.

The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

24. CIPA specifically prohibits the installation or use of "pen registers" and "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

25. A "pen register" is defined as a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, excluding the contents of the communication (Cal. Penal Code § 638.50(b)).

26. Conversely, a "trap and trace device" captures incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, again excluding the contents (Cal. Penal Code § 638.50(b)).

27. In practical terms, a pen register records outgoing dialing information, while a trap and trace device records incoming dialing information.

28. Historically, law enforcement has utilized these devices to monitor telephone calls, with pen registers recording outgoing numbers dialed from a specific line and trap and trace devices recording incoming call numbers to that line.

29. Although originally focused on landline telephone calls, CIPA's scope has expanded to encompass various forms of communication, including cell phones and online interactions. For instance, if a user sends an email, a pen register could record the sender's email address, the recipient's email address, and the subject line—essentially capturing the user's outgoing information.

30. Similarly, if the user receives an email, a trap and trace device could record the sender's email address, the recipient's email address, and the subject line—capturing the incoming information.

31. Despite predating the Internet, CIPA has been interpreted by the California Supreme Court to apply to new technologies where such application does not conflict with the statutory scheme (*In re Google Inc.*, 2013 WL 5423918, at *21; *Greenley*, supra, 2023 WL 4833466, at *15; *Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1). This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations (*Matera v. Google Inc.*, 2016 WL 8200619, at *19).

32. The alleged conduct by the defendant constitutes an invasion of a legally protected interest that is both concrete and particularized. Violations of the right to privacy have long been actionable at common law (*Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019)). The right to privacy encompasses an individual's control over personal information (*Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017)).

33. Both legislative history and statutory text indicate that Congress and the California Legislature intended to protect these historical privacy rights when enacting CIPA (Cal. Pen. Code § 630). Therefore, CIPA codifies a substantive right to privacy, the violation of which results in a concrete injury sufficient to confer standing (*Campbell v. Facebook, Inc.*, —F.3d—, 2020 WL 1023350, at *7–8; *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020)).

34. Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation (Cal. Penal Code § 637.2(a)(1)).

**2. *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

35. When the Plaintiff and Class Members accessed the Website, their browsers initiated an HTTP or HTTPS request to Defendant's web server, which hosts the content and functionality of the site. In response, the server transmitted an HTTP response containing the necessary resources—including HTML, cascading style sheets (CSS), JavaScript files, and image assets—used by the browser to render and display the webpage. These resources also included client-side scripts that initiate

communication with third-party services for analytics, marketing, and tracking purposes. ***Figure 1*** below illustrates sample HTTP requests.

***Figure 1***




36. The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data — typically via HTTPS requests — to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data—referred to as User Information—included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

37. The Trackers operate by initiating HTTP or HTTPS requests—using either the GET or POST method—from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and device metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

38. An Internet Protocol (IP) address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication

between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.* (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). IP addresses enable routing of data between devices and can be used—via external geolocation services—to infer a user's general location, including state, city, and in some cases, ZIP code.

39. Public IP addresses are unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access and can be used to approximate a device's physical location through geolocation services.

40. In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. They are isolated from the global Internet and can be reused across different networks without conflict. Unlike public IP addresses, private IP addresses do not divulge a user's geolocation.

41. Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting—particularly when combined with other tracking identifiers and third-party enrichment.

42. A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

43. As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

44. Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

**3. *The Use of Pixel Trackers or Beacons and Digital Fingerprinting***

45. Website users typically expect a degree of anonymity when browsing, particularly when they are not logged into an account. However, upon visiting the Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts embedded by the Defendant. These Trackers operate in the background of the browsing session and collect detailed behavioral and technical information, which is then transmitted to external third-party servers without the users' active awareness.

46. This process, known as digital fingerprinting, involves compiling various data points—such as browser version, screen resolution, installed fonts, device type, and language settings—to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

47. When combined with additional tracking mechanisms—such as cookies, login data, and third-party enrichment services—fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint—especially when correlated with other identifiers such as

email addresses, form submissions, or third-party databases—can enable the reidentification of a user.

48. The ability to associate a persistent digital profile with a specific individual—using techniques such as digital fingerprinting—has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

49. In simpler terms, pen register and trap and trace mechanisms in the digital context refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics—information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded or injected in the Website, which operate without user interaction or visibility.

50. The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

51. When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the

Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4. *Plaintiff's And Class Members' Data Has Financial Value***

52. Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[1]

53. Consumers' web browsing histories have an economic value more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[2]

54. There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[3]

55. Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[4]

56. In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and

[1] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

[2] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[3] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

[4] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[5]

57. The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[6]

58. The Defendant's monetization of personal data constitutes actionable economic harm under federal law, even without evidence of a direct financial loss, as a "misappropriation-like injury" caused by converting user data into a revenue stream through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020).

**5. *Defendant Is Motivated To Monetize Consumer Information Regardless of Consent***

59. By implementing Trackers on the Website, Defendant participates in building detailed behavioral profiles of visitors. These profiles include information such as which users viewed specific products, whether they initiated but abandoned the checkout process, and what pages or buttons they interacted with. This data enables Defendant and its advertising partners to identify repeat visits from the same device or browser. This behavioral data is integrated into third-party advertising platforms,

---

[5] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[6] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

allowing Defendant to deliver retargeted ads to users who previously visited the Website, offer promotional incentives to users who showed purchase intent, and build "lookalike audiences" that target users with similar behaviors or characteristics. These practices significantly improve advertising efficiency and increase the likelihood of converting user engagement into actual sales.

60. Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018 from mining and selling data. That figure is expected to increase with estimates for 2022 as high as $434 per use, reflecting a more than $200 billion industry.

61. Defendant has a strong financial incentive to deploy the Trackers on its Website without obtaining user consent. By enabling the collection of IP addresses and device-level identifiers through these technologies, Defendant facilitates integration into real-time bidding ecosystems. These systems rely on bidstream data—such as IP address, device type, screen resolution, and referral information—to assess the value of a potential ad impression. This enables Defendant and its partners to participate in data-driven ad targeting, increase the value of its advertising inventory, and track users across sessions and websites, all of which provide economic benefit despite private implications to users.

62. IP addresses are a valuable data point in digital advertising and tracking systems. They can be used to approximate a user's geographic location, often down to the city or ZIP code level, enabling location-based targeting. When combined with cookies, browser metadata, and device identifiers, IP addresses contribute to persistent user tracking across sessions and websites. They also assist advertisers and data brokers in linking anonymous browsing activity to existing user profiles, which enhances ad targeting precision and increases the commercial value of each tracked interaction. IP addresses therefore constitute "routing, addressing, or signaling information" protected under CIPA § 638.50(b).

63. When users' data is collected without meaningful consent and monetized,

they lose control over who can access, use, or distribute their personal information. Data brokers and ad tech firms aggregate and correlate identifiers—such as IP addresses, device IDs, and cookies—with other personal data to construct detailed consumer profiles. Information initially gathered in one context, such as browsing a retail website, is frequently repurposed for unrelated uses and sold to third parties without the user's awareness. This results in pervasive surveillance, where users are continuously tracked across multiple websites, applications, and devices, often without their knowledge or ability to opt out.

**6. *The Trackers Function Together to Achieve Targeted Objectives***

64. When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

65. On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

66. On information and belief, Defendant utilizes an integrated system of third-party tracking technologies — including AdRoll, Google Tag Manager, Facebook Pixel, and The Trade Desk — to accomplish its digital marketing objectives of behavioral tracking, identity resolution, targeted advertising, and data monetization.

67. Google Tag Manager ("GTM") acts as the orchestrator of all other trackers. Once the GTM container is loaded onto the Website, it dynamically injects

and controls the behavior of other third-party scripts, including but not limited to those from AdRoll, Facebook, and The Trade Desk. GTM enables conditional deployment of trackers based on user actions or page visits, allowing BMO to centrally manage data capture across its digital properties.

68. The Facebook Pixel, deployed via connect.facebook.net and facebook.com/tr/, is a behavioral tracking tool. It records granular user events such as page views, button clicks, and form submissions. This data is sent back to Meta, where it is matched against user profiles across Facebook, Instagram, and the wider Meta ecosystem. This allows Defendant to build retargeting audiences and track conversion behavior for individuals who interact with Facebook ads.

69. The AdRoll tracker, typically served from d.adroll.com, captures cross-site user behavior to support retargeting and programmatic advertising. Once a user visits the Website, AdRoll records their activity and builds behavioral segments (e.g., users interested in mortgage calculators). These segments are then used to deliver personalized display ads across a wide network of third-party websites.

70. The Trade Desk tracker, associated with the domain adsrvr.org, is a real-time bidding platform. It is used to perform identity resolution and behavioral tracking across the open web. By collecting data on user behavior, the Trade Desk Tracker enables Defendant to participate in real-time ad auctions, where impressions are sold and purchased based on individual-level profile data. This includes syncing identifiers and serving dynamic ads tailored to past browsing behavior.

71. Together, these trackers function as a unified ecosystem: Google Tag Manager loads the scripts; Facebook collects behavioral signals and attribute conversions; AdRoll and The Trade Desk conduct cross-site profiling and retargeting. Each component feeds into Defendant's broader digital strategy of profiling users, matching their behavior to known or anonymized identities, and optimizing ad delivery based on real-time data signals.

72. The synergistic deployment of these technologies allows Defendant not

only to understand what users do on its site, but also to reach those users again — with precise messaging — across a multitude of platforms, browsers, and devices. This system facilitates persistent behavioral tracking, profiling, and monetization of user data.

## V. <u>SPECIFIC ALLEGATIONS</u>

### *1. The AdRoll Tracker*

73. The AdRoll Tracker, typically served from the domain d.adroll.com, is a behavioral advertising pixel owned and operated by NextRoll, Inc. (formerly AdRoll, Inc.). It is a cross-site tracking technology designed to monitor users' online activity and serve personalized, retargeted advertisements based on individual behavior.

74. The AdRoll Tracker records detailed user behavior on the Website, including pages visited, time spent, product views, clicks, and abandonments. This data is analyzed to create behavioral segments (e.g., "home loan interest," "wealth management prospects," etc.). These segments are then used to display personalized ads to the same users across thousands of third-party websites, including news outlets, retail sites, and social media.

75. The AdRoll Tracker is designed to utilize device fingerprinting, cookie syncing, and hashed email matching to persistently identify users across devices and sessions. Through programmatic ad exchanges, the AdRoll Tracker enables Defendant to participate in real-time auctions for ad impressions, using the behavioral data collected to bid higher for users deemed more valuable.

76. Defendant installed, executed, embedded, or injected the AdRoll Tracker onto users' browsers. ***Figure 2*** below is a screenshot of the Website, which documents a successful request to AdRoll's tracking infrastructure — conclusive proof that the tracker was operational and used to monitor user behavior during web sessions:

/ /

/ /

***Figure 2***




77. ***Figure 3*** below is a screenshot of web activity on the Website, which depicts a DNS response confirming that the user's device successfully resolved and connected to AdRoll's tracking servers — a DNS resolution that establishes AdRoll's role as an active third-party tracker engaged during the browsing session:

***Figure 3***




78. The AdRoll Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

79. The AdRoll Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

80. The AdRoll Tracker initiates a connection to AdRoll's servers upon page load or user interaction, resulting in the collection of addressing and signaling data — including IP addresses, user-agent strings, full URL paths, timestamps, and referrer headers — which together identify both the source and destination of each web communication initiated by the user's browser. As such, it functions in a manner consistent with a pen register (by capturing outgoing user communications metadata) and a trap and trace device (by capturing incoming communication metadata).

81. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' consent to install the AdRoll Tracker or to collect or share data with NextRoll, Inc.

82. Defendant's secret installation of the AdRoll Tracker on the Website violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

**2. *Google Tag Manager***

83. Google Tag Manager ("GTM") is a tag management system developed by Google that allows website operators to insert, manage, and control tracking scripts and pixels from a centralized interface—without directly editing the website's source code. It functions as a container that dynamically loads other tracking technologies, including but not limited to such software as Google Analytics, Facebook Pixel, advertising conversion trackers, heatmaps, user surveys, and custom behavioral scripts. It can trigger scripts based on specific user interactions, such as page views, button clicks, or form submissions.

84. GTM facilitates and orchestrates third-party tracking activity—often invisibly to the end user—by enabling the injection of marketing, analytics, and

behavioral scripts. It plays a critical role in the backend data infrastructure that powers ad targeting and user retargeting, effectively serving as a real-time control panel for digital surveillance and behavioral data harvesting.

85. Google installs or uses GTM on the Website. ***Figure 4*** below is a screenshot from the Website showing the initialization of the gtm.js script on page load — confirming that GTM is operational and functioning as a tag management system to load tracking tools and facilitate behavioral monitoring:

***Figure 4***




86. ***Figure 5*** below is a screenshot from the Website, which reflects network activity on the Website, including a DNS response confirming resolution of Google's static content delivery domain — a core component of GTM's infrastructure. This resolution confirms that GTM was actively deployed during the user session and functioned as a tracking orchestrator by loading additional third-party scripts and tags:

/ /

/ /

/ /

/ /

***Figure 5***




87. ***Figure 6*** below, is a screenshot that reflects network activity on the Website, demonstrating that Google's API service was successfully resolved via the DNS, thereby confirming an attempted connection to Google's infrastructure and affirmatively establishing that GTM is in use to coordinate third-party tracking scripts:

***Figure 6***




88. Google associates the behavioral data collected through its tools—including page views, session duration, click paths, and conversion events—with

persistent user identifiers, such as cookies and IP addresses. In certain configurations, Google may also rely on device characteristics or browser fingerprints for probabilistic user identification or fraud prevention. This behavioral data is integrated into Google's broader advertising infrastructure, which spans millions of websites and mobile applications. Through GTM, the website may also deploy additional third-party trackers—including but not limited to Facebook Pixel—enabling coordinated data collection across multiple advertising ecosystems.

89. Google retains much of the behavioral and demographic data it collects for its own advertising purposes. This enables continuous cross-site tracking, dynamic audience profiling, and predictive targeting—even when the user does not interact with or click on an advertisement. As a result, Google often acts as a data controller, particularly when logged-in user behavior is involved, using the collected information to support its extensive digital advertising and data monetization operations.

90. Defendant surreptitiously installed, executed, embedded or injected the GTM by copying Google's JavaScript code snippet and adding it to the Website. When a user visits the Website, their browser executes the JavaScript snippet which sends data about the user's interactions, including the user's IP address, to Google's servers.

91. GTM is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

92. GTM is at least a "device" because for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

93. On the inbound side, GTM-enabled scripts collect metadata including HTTP referrers, IP addresses, language headers, screen resolution, and cookie-based identifiers. On the outbound side, this data is transmitted to third-party advertising vendors — including Google — for use in real-time bidding and user profiling.

94. Defendant never obtained a court order permitting the installation of a pen register device or process and did not obtain Plaintiff's or the Class Members'

express or implied consent to install GTM on Plaintiff's and Class Members' browser or to collect or share data with Google.

95. GTM violates CIPA regarding unauthorized use of a pen register and/or trap and trace device without prior consent or court order.

96.

### *3. The Facebook Tracker*

97. The Facebook Tracker is a behavioral tracking script employed via domains such as connect.facebook.net and facebook.com/tr/. On the Website, the Facebook Tracker is embedded through a JavaScript snippet and/or loaded dynamically through Google Tag Manager.

98. Once the user loads a page, the Facebook Tracker executes automatically, capturing information such as page views, button clicks, form interactions, and scroll behavior. These interactions are sent back to Meta's servers and associated with the user's Facebook or Instagram profile — even if the user never directly interacts with Meta while on the Website.

99. The data collected by the Facebook Tracker supports identity resolution by linking behavioral data from the Website with individual user profiles across Meta's platforms. If the user is logged into Facebook, Instagram, or Messenger on the same device or browser, the Meta Pixel can tie Website behavior to the user's unique Meta ID. This linkage allows Meta to build persistent, cross-site user profiles that include financial interest signals, such as engagement with mortgage tools, financial calculators, or account services. Even if the user is not logged in, Meta can assign a persistent identifier via first- and third-party cookies, pixel fires, or browser fingerprinting.

100. The Facebook Tracker also serves BMO's goal of targeted advertising by enabling the creation of "Custom Audiences" — groups of users who have taken specific actions on BMO's site, such as visiting the home equity loan page or starting an application. BMO can then use Facebook Ads Manager to re-target those users with ads across Facebook and Instagram, or use "Lookalike Audiences" to reach new users

who exhibit similar online behavior. This cycle enables precise, cost-efficient delivery of BMO's advertising to consumers who are more likely to convert.

101. The Facebook Tracker contributes to BMO's data monetization strategy by turning behavioral insights into measurable advertising ROI. By tracking users across pages and sessions, Meta provides BMO with real-time analytics about user behavior, ad performance, and customer engagement. The Facebook Tracker closes the feedback loop between website behavior and ad delivery, allowing BMO to optimize ad spend, personalize messaging, and extract greater value from each visitor interaction. In this way, the Facebook Tracker functions as a critical part of BMO's commercial surveillance infrastructure, facilitating continuous behavioral profiling, identity matching, and monetization of user activity.

102. ***Figure 7*** below, is a screenshot from the Website, confirming that the Facebook Tracker script was loaded upon page load, prior to user consent, triggering communication with Meta's tracking infrastructure and the collection of user behavior data:

***Figure 7***



103. ***Figure 8*** below is a screenshot of web activity on the Website, confirming the presence of DNS queries to Meta's tracking domains (e.g., connect.facebook.net), proving that the Facebook Pixel was operational and engaged in third-party data collection during the session:

***Figure 8***




104. Defendant surreptitiously installed, executed, embedded, or injected the Facebook Tracker onto users' browsers by copying the JavaScript code snippet and adding it to the Website. When a user visits the Website, their browser executes the JavaScript code which sends data about the user's interactions, including the user's IP address, to Facebook's servers as part of third-party tracking and advertising infrastructure.

105. The Facebook Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

106. The Facebook Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. *See*, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

107. The Facebook Tracker captures and transmits routing, addressing, and signaling information — such as the user's IP address, page URL, referrer, and browser metadata — to Meta's servers the moment a page loads, often without the user's

knowledge or consent. This type of metadata identifies the origin and destination of an electronic communication. Critically, the user is not attempting to communicate with Facebook; the connection is silently triggered by code embedded in the website, enabling Meta to intercept and persistently associate the user's behavioral signals with a known or inferred identity, enabling commercial surveillance through passive third-party data collection.

108. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install the Facebook Tracker on Plaintiff's and Class Members' browser or to collect or share data with Facebook.

109. Consequently, the Facebook Tracker violates CIPA regarding unauthorized use of a pen register without prior consent or court order.

***4. The Trade Desk Tracker***

110. The Trade Desk Tracker, typically delivered via the domain adsrvr.org, is a third-party behavioral tracking pixel. On the BMO website, this tracker is either embedded directly or injected dynamically through a tag management system like Google Tag Manager. When a user visits the site, the tracker initiates a connection to The Trade Desk's servers, capturing a range of data points including IP address, device type, browser version, geolocation, and unique cookie or device identifiers. These interactions confirm that the user's activity is being observed and recorded for later use in digital advertising campaigns.

111. Once activated, the Trade Desk Tracker plays a central role in identity resolution by assigning users a persistent identifier that can be recognized across other websites, apps, and devices. This is accomplished through techniques such as cookie syncing, hashed email matching, and participation in the Trade Desk's Unified ID 2.0 (UID2) system — an identity framework designed to replace third-party cookies. These tools allow The Trade Desk to connect behavioral data collected on BMO's site with broader user profiles across the internet, creating a cohesive view of an individual's

online behavior even when they are not logged in.

112. In terms of targeted advertising, the Trade Desk Tracker enables BMO to reach users who previously visited the Website, viewed financial products, or began applications — through retargeting ads served across thousands of partner websites and ad exchanges. The Trade Desk Tracker's data enrichment tools allow BMO to identify behavioral traits and interests among their site visitors, and then build lookalike audiences composed of similar users for future ad campaigns. This significantly enhances BMO's ability to reach new but relevant users who are likely to be interested in its financial services.

113. The Trade Desk Tracker supports BMO's broader objective of data monetization by transforming real-time behavioral signals into actionable, revenue-generating insights. By tracking users across multiple touchpoints and matching them to advertising segments, BMO gains access to detailed performance analytics and the ability to optimize ad spend. The data collected feeds into a programmatic ad-buying ecosystem where advertisers compete to show personalized ads to high-value users — often based on the very behavioral traits observed on BMO's site. In this way, The Trade Desk enables BMO to extract commercial value from user activity, while facilitating profiling and ad delivery practices.

114. ***Figure 9*** below reflects a DNS query to The Trade Desk Tracker's tracking infrastructure, demonstrating that the tracker was operational during the user session and functioning to transmit routing and signaling metadata:

/ /

/ /

/ /

/ /

/ /

/ /

***Figure 9***




115. Defendant surreptitiously installed, executed, embedded or injected The Trade Desk Tracker onto users' browsers by copying the JavaScript code snippet and adding it to the Website. When a user visits the Website, their browser executes the JavaScript code which sends data about the user's interactions, including the user's IP address, to BMO's servers.

116. The Trade Desk Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

117. The Trade Desk Tracker is at least a "device" because in order for software to work, it must be run on some kind of computing device. See, e.g., *James v. Walt Disney Co.* 2023 WL 7392285 at *13 (N.D. Cal. Nov. 8, 2023).

118. The Trade Desk Tracker initiates a connection to its ad infrastructure upon page load via a script or pixel execution. It captures user metadata such as IP address, page path, timestamp, and unique identifiers — all of which qualify as routing or signaling information under CIPA.

119. The user is not intentionally initiating any communication with The Trade Desk; rather, the connection is automatically triggered in the background by embedded third-party code. As a result, The Trade Desk is able to silently intercept, and

log communication-related data generated during the user's interaction with the Website. In this way, the Trade Desk Tracker functions as a surveillance mechanism that captures third-party signaling information.

120. Defendant never obtained a court order permitting the installation of a pen register or trap and trace device or process and did not obtain Plaintiff's or the Class Members' express or implied consent to install The Trade Desk Tracker on Plaintiff's and Class Members' browser or to collect or share data with The Trade Desk.

121. Consequently, The Trade Desk Tracker violates CIPA regarding unauthorized use of a pen register without prior consent or court order.

## VI. CLASS ALLEGATIONS

122. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California on whose browser Defendant installed, executed, embedded or injected the Trackers without a court order or consent within the statute of limitations period.

123. **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

124. **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Plaintiff and Class Members are subject to same tracking

policies and practices;

- Whether Plaintiff and Class Members are entitled to statutory penalties;
- Whether Class Members are entitled to injunctive relief;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained;
- Whether the Defendant's conduct violates the Cal. Civil Code § 1798.100, *et seq.;* and
- Whether the Defendant's conduct constitutes an unlawful, misleading, deceptive or fraudulent business practice

125. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

126. **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

127. **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

## VII. FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 638.51

***By Plaintiff Against All Defendants***

128. Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

/ /

129. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

130. Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

131. Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users of its Website and has thus violated CIPA.

132. CIPA imposes civil liability and statutory penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal. July 25, 2024).

## **VIII. <u>SECOND CAUSE OF ACTION</u>**

### **Violations of Cal. Civil Code § 1798.100, *et seq.***

### ***By Plaintiff Against All Defendants***

133. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

134. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

135. The CCPA grants consumers legal rights subject to statutory protection, including the right to know what personal information is being collected about them and whether that information is sold or disclosed and to whom, the right to prohibit the sale of their personal information, the right to request deletion of their personal information, and the right to nondiscrimination in service and price when they exercise privacy rights. Ca. Civil Code § 1798.100 *et seq*.

136. The CCPA defines "personal information" broadly to include "...information that identifies, relates to, describes, is reasonably capable of being

associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household." Cal. Civil Code § 1798.140.

137. The CCPA dictates specifically that "[a] third party shall not sell or share personal information about a consumer that has been sold to, or shared with, the third party by a business unless the consumer has received explicit notice and is provided an opportunity to exercise the right to opt-out." Cal. Civil Code § 1798.115.

138. Defendant collected Plaintiff's and Class Members' personal information with the purpose of resolving their identities and locating them for targeted marketing in the course of and as part of its business with California consumers.

139. Disclosing Plaintiff's and Class Members' personal information was not reasonably necessary or proportionate to perform Defendant's reasonably expected online services.

140. By collecting, using, and/or selling Plaintiff's and Class Members' personal information and location data to Third Parties without providing sufficient notice, Defendant violated CCPA.

141. By failing to inform Plaintiff and Class Members of the personal information collected about them and that their personal information was shared with the Third Parties, Defendant violated CCPA.

142. Defendant fails to provide users with clear and conspicuous notice at or before the point of collection of personal information, in violation of Civil Code § 1798.100(b). The Website employs multiple third-party trackers, and advertising requests are initiated as soon as users load the Website before any opportunity to review or acknowledge the Defendant's policies or exercise data rights.

143. Defendant enables the transmission of personal data, including cookies, device identifiers, and browsing metadata, to third-party advertisers and tracking services without first offering users a meaningful opportunity to opt out, in violation of Civil Code § 1798.120(a). These data transmissions occur upon site load, prior to any interaction by the user.

144. Defendant claims in its privacy policy that it honors Global Privacy Control and similar browser-based opt-out mechanisms. However, the Website employs tracking scripts and advertising pixels that are served unconditionally, regardless of the presence of GPC or other Do Not Track signals, in violation of Civil Code § 1798.135(b)(1).

145. Defendant discloses personal information, including users' IP addresses, geolocation, cookies, and device fingerprints, to numerous third-party advertising and analytics providers for purposes of behavioral advertising. Such disclosures constitute "sharing" of personal information under Civil Code § 1798.140(ad), and are carried out without consumer authorization.

146. Sensitive identifiers such as IP address, geolocation, browser fingerprint data, and behavioral history are collected through the Website and shared without user opt-in. This practice is contrary to Defendant's published privacy policies and violates Civil Code § 1798.121(a), which requires affirmative consent before processing sensitive personal information for purposes beyond what is necessary to provide the requested services.

147. Defendant subjects consumers' personal information, including unencrypted identifiers, tracking cookies, and session data, to unauthorized disclosure through its use of third-party tracking scripts and lack of sufficient safeguards. This conduct reflects a failure to implement and maintain reasonable security procedures and practices, in violation of Civil Code § 1798.150.

148. On June 25, 2025, Plaintiff provided Defendant with written notice pursuant to California Civil Code § 1798.150(b), identifying the specific provisions of the CCPA that Defendant violated. The letter was sent on behalf of Plaintiff and all others similarly situated.

149. Plaintiff, on behalf of himself and the Class Members, hereby seeks injunctive relief and statutory damages pursuant to California Civil Code § 1798.150.

/ /

## IX. THIRD CAUSE OF ACTION

**Violations of Business & Professions Code § 17200**

***By Plaintiff Against All Defendants***

150. Plaintiff realleges and incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

151. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

152. This cause of action is brought under California Business & Professions Code § 17200 et seq., which prohibits any unlawful, unfair, or fraudulent business act or practice.

153. Defendant has engaged in unlawful business practices by:

(a) Violating California Penal Code §§ 638.50–638.56, including the unauthorized collection of addressing, signaling, and routing information for user identification and tracking; and

(b) Violating California Civil Code § 1798.100, *et seq.*, including collecting, using, and/or selling Plaintiff's and Class Members' personal information and location data to Third Parties without providing sufficient notice. Privacy rights rooted in the CCPA are a protected interest enforceable under Business & Professions Code § 17200. *Briskin v. Shopify, Inc.*, 101 F.4th 706 (9th Cir. 2025) (en banc).

154. Defendant has engaged in unfair business practices by embedding the Trackers into the Website and enabling the real-time capture and transmission of Plaintiff's and Class Members' personal and behavioral information, such as IP address, browser details, visited URLs, referrer paths, timestamps, and interaction events, to the Third Parties.

155. The Defendant's practices are contrary to public policy supporting consumer privacy and data autonomy, and the harm it causes to consumers, including loss of control over personal information and risk of profiling, outweighs any legitimate business justification.

156. Defendant has engaged in fraudulent business practices by failing to adequately disclose its data-sharing practices. On information and belief, Defendant omitted material facts from its privacy policy and/or site interface and failed to inform users that their activities would be tracked across the internet and linked to unique identifiers for advertising and profiling purposes. These omissions were likely to deceive a reasonable consumer and were intended to obscure the nature and extent of the surveillance.

157. As a direct and proximate result of Defendant's unlawful, unfair, and fraudulent conduct, Plaintiff and the Class Members have suffered injury in fact and loss of money or property, including the unauthorized exfiltration and commodification of valuable personal data. Plaintiff's and Class Members' data—used for targeted advertising, behavioral modeling, and enrichment by third parties—constitutes digital property with measurable economic value.

158. Plaintiff on behalf of himself and on behalf of the Class Members seeks injunctive relief to prevent Defendant from continuing its deceptive and unlawful data tracking practices and to require clear and conspicuous notice and opt-in consent for any behavioral tracking involving third-party tools. Plaintiff on behalf of himself and on behalf of the Class Members, also seeks restitution of the value derived from the unauthorized use of their personal information, attorneys' fees where permitted by law, and such other and further relief as the Court may deem just and proper.

## X. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates CIPA, the CCPA, and Business & Professions Code § 17200;
3. An order of judgment in favor of Plaintiff and the Class against Defendant on the causes of action asserted herein;

4. An order enjoining Defendant's conduct as alleged herein;

5.

6. Statutory damages pursuant to CIPA and CCPA;

7. Prejudgment interest;

8. Reasonable attorney's fees and costs; and

9. All other relief that would be just and proper as a matter of law or equity.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all claims so permitted.

Dated: July 8, 2025 **NATHAN & ASSOCIATES, APC**

By: /s/ *Reuben D. Nathan, Esq.*
Reuben D. Nathan
Attorney for Plaintiff

## EXHIBIT A

- Demandbase
- Adobe Analytics
- Salesforce Interaction Studio (Evergage)
- Adobe Audience Manager (Demdex)
- Evergage
- PebblePost
- Casale Media (Index Exchange)
- Tremor Video
- Rubicon Project (Magnite)
- LinkedIn Ads / Insights
- Qualtrics
- Bing Ads